UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SYLVIA RODRIGUEZ,

               Plaintiff,             Case No. 1:22-cv-372

v.                                  Hon. Hala Y. Jarbou

BLOCK, INC.,

               Defendant.

_____/

**REPORT AND RECOMMENDATION**

Plaintiff Sylvia Rodriguez has filed this action against Block, Inc. for claims arising out of her use of a cellphone application, Cash App. Amend. Compl. (ECF No. 17).  This matter is now before the Court on defendant's combined "Motion to compel arbitration and dismiss plaintiff's amended complaint or stay proceedings, or, alternatively, dismiss plaintiff's amended complaint with prejudice" (ECF No. 21).

**I.      The Amended Complaint**

Plaintiff alleged that she was a victim of fraud and identity theft.  Amend Compl. at PageID.192.  Specifically, a "Mr. Humphrey" used deceptive tactics to have plaintiff send him funds to invest in gold bars.  *Id*.  Humphrey's scheme was unmasked by another victim who reported it to the bank.  *Id*. at PageID.193. Either authorities or someone from the bank informed plaintiff that she was a victim.  *Id*.  Plaintiff summarized her claims as follows:

> Rodriguez filed an identity theft report with the Federal Trade Commission and Wyoming Police Department of Michigan as her personal information, including her bank account and home address and identity had been compromised. Rodriguez was defrauded for over $40,000 her entire life savings. Rodriguez attempted to file a chargeback dispute and submitted an identity theft report with Cash App and the advocate refused to allow her to do so. Rodriguez also tried to

1

submit an identity report with Cash App and they refused to accept it from her and required the police department to so. Rodriguez asked the police and they recommended she submit it because they are not required to. Cash App has all of Rodriguez transactions of the defrauded funds and information on the chat log of all her disputes and stopped her from finishing because they did not want Rodriguez to file a dispute. On are around April 3, 2022 Rodriguez filed a complaint with the consumer Financial Protection Bureau and Cash App still refused to allow Rodriguez to imitate a chargeback dispute. More facts may be discussed in this pleading. It should be note that Rodriguez second language is English and she has a hard time reading English and is getting help preparing her pleadings.

*Id.*

Plaintiff alleged that defendant violated federal statutes:

Cash App is in violation of the (EFTA) [Electronic Fund Transfer Act] for not allowing Rodriguez to file a charge back dispute of her defrauded funds. Also the fair and accurate credit transactions act for not reporting the identity theft report to the Credit Bureaus, and failure to provide an independent investigation that is investing the scam and considering her identity theft report on regards of her charge back dispute and violation of the fair credit reporting Act that is alerting the Credit Bureaus of the identity theft report and the federal deposit insurance incorporated (FDIC) [Federal Deposit Insurance Corporation] of the fraud and to take into account her identity theft report which should have been submitted by Cash App to the (FDIC), and file a claim to recover her funds which are insured by the FDIC.

Rodriguez should be allowed to recover her funds through the (FDIC) and Cash App should allow her initiate a dispute of the defrauded transactions that Cash App has on file. Rodriguez has a due process right to seek recovery as she has done her due diligence and complained with law enforcement, which is aware that she was a victim of an online scam.

Rodriguez also risks present and future retaliation by Block, by her account being closed and being forced to not [sic] business with Block again.

Rodriguez also claims the doctrine of unclean hands, as she is acting in good faith and Block is acting in bad faith by not initiating a charge back dispute and filing a claim of her defrauded funds under the FDIC.

*Id.* at PageID.193-194.

Plaintiff also alleged a state claim under the Michigan Consumer Protection Act,

Rodriguez rights under the Michigan Consumer Protection Act has been violated due to the deceptive practices of Cash App by refusing to allow her to initiate an independent chargeback dispute to recover her defrauded funds, and

attempting to make a high standard of her claim by requiring the Police to get involved that is specifically call Block and explain the matter, when she has already submitted the identity theft report with the contacting Police officer and case number to find out any further details of the incident concerning her identity theft report.

*Id*. at PageID.194.  Finally, plaintiff alleged additional state claims for "negligent and or intentional infliction of emotional distress" due to "Cash App['s] refusal to allow her due process right to recover her defrauded funds."  *Id*.  Plaintiff seeks $190,000.00 in damages or in the alternative "order Cash App to initiate a charge back dispute and to law her to recover her defrauded funds of $40,000 via (FDIC)."  *Id*. at PageID.195.

## II.    Motion to dismiss

Defendant moved to dismiss this action for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).  A complaint may be dismissed for failure to state a claim if it fails to give the defendants a fair notice of the claim and the grounds upon which it rests.  *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007).

[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)  (internal citations and quotation marks omitted).

In making this determination, the complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true.  *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).  In this regard, "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to

3

dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. National Collegiate Athletic Association*, 528 F.3d 426, 430 (6th Cir. 2008). While *pro se* pleadings are to be liberally construed, *see Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011), "this court is not required to conjure up unpled allegations." *Dietz v. Sanders*, 100 Fed. Appx. 334, 338 (6th Cir. 2004).

Plaintiff appears to set forth four federal claims and five state law claims in her amended complaint.  Plaintiff's federal claims are: (1) that Cash App violated EFTA because it did not allow plaintiff "to file a charge back dispute of her defrauded funds;" (2) that Cash App violated "the fair and accurate credit transactions act for not reporting the identity theft report to the Credit Bureaus"; (3) that Cash App failed to provide an independent investigation of the investing scam, charge back dispute, and identity theft in violation of the Fair Credit Reporting Act; and (4) that Cash App failed to take steps to recover her funds from the FDIC.  Amend. Compl. at PageID.193-194.  Plaintiff's state law claims are: (1) that Cash App engaged in deceptive practices which violated the Michigan Consumer Protection Act; (2) that Cash App engaged in the negligent infliction of emotional distress; (3) that Cash App engaged in the intentional infliction of emotional distress; (4) that defendant has unclean hands; and (5) that plaintiff risks "present and future" retaliation by defendant.

Defendant contends that plaintiff's complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because it fails to state a clam for relief that is plausible on its face, and that it should be dismissed for lack of federal jurisdiction pursuant Fed. R. Civ. P. 12(b)(1) because it is totally implausible, attenuated, unsubstantial, frivolous, devoid of merit, or no longer open for discussion. Defendant's Brief (ECF No. 22, PageID.216, 221-226).  Defendants provide only a conclusory argument on both the federal jurisdictional claim and the federal claims.  *Id.* at

4

PageID.221-223.   The basis for defendant's motion is that "Plaintiff has made only minimal allegations relating to any purported conduct by Block, and she does not specify how any such conduct satisfies the requirements for any of her 'claims.'"   Defendant's Brief at PageID.222. Defendant does not address the elements of the alleged statutory violations or how plaintiff failed to meet those elements of those violations.   "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to  . . . put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).  Accordingly, defendant's motion to dismiss the amended complaint for lack of federal subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) should be denied, and its motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) should be denied as to plaintiff's federal and state statutory violations.

However, plaintiff has failed to state a claim for any of the alleged state law torts. Plaintiff's cursory references to "unclean hands" and "retaliation" are not sufficient to state a cause of action.   The doctrine of unclean hands "is a defense to an action in equity, not an independent cause of action."  *Beard v. HSBC Mortgage Services, Inc.*, No. 1:15-cv-1232, 2016 WL 3049310 at *6 (W.D. Mich. May 31, 2016).   In addition, simply referring to "retaliation" does not state a cause of action.  *See Iqbal*, 556 U.S. at 678 ("an unadorned, the - defendant - unlawfully - harmed - me accusation" is insufficient to state a claim for relief).   Accordingly, these two state law claims should be dismissed.

In addition, defendant seeks to dismiss plaintiff's claim for the state law tort of negligent infliction of emotional distress.  "Although Michigan recognizes claims for negligent infliction of emotional distress, such claims are limited to situations involving the plaintiff's

witnessing negligent injury to an immediate family member and suffering severe mental distress causing actual physical harm." *Gillespie v. City of Battle Creek*, 100 F. Supp. 3d 623, 634 (W.D. Mich. 2015). *See, e.g.*, *Duran v. Detroit News, Inc.*, 200 Mich. App. 622, 629, 504 N.W.2d 715 (1993) ("we decline to apply the tort of negligent infliction of emotional distress beyond the situation where a plaintiff witnesses negligent injury to a third person and suffers mental disturbance as a result"). Here, plaintiff has not alleged any injury to a third party. Plaintiff has failed to state a claim for negligent infliction of emotional distress. Accordingly, this claim should be dismissed.

Defendant also seeks to dismiss plaintiff's claim for the state law tort of intentional infliction of emotional distress. This tort of has four elements:

> (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. . . . Liability for such a claim has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

> *Haverbush v. Powelson*, 217 Mich. App. 228, 233–34, 551 N.W.2d 206 (1996) (citations omitted).

*Howard v. Calhoun County*, 148 F. Supp. 2d 883, 892 (W.D. Mich. 2001).

Here, plaintiff alleged that a person named Mr. Humphrey somehow deceived her into investing in gold bars, stole her identity, and caused her to lose $40,000.00. Assuming that plaintiff's allegations are true, Mr. Humphrey engaged in outrageous conduct. However, plaintiff's claims in this case are not against Mr. Humphrey. Plaintiff's claim is that defendant failed to take corrective action because plaintiff or Mr. Humphrey used defendant's cellphone application to transfer the funds. Plaintiff's claim against defendant arises from a business transaction and a dispute with respect to her rights under the Cash App agreement. Plaintiff's

alleged dealings with defendant were not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *See Howard*, 148 F. Supp. 2d at 892. Accordingly, plaintiff's claim for intentional infliction of emotional distress should be dismissed.

### III.    Defendant's motion to compel arbitration

### A.    Legal Standard

Defendant also seeks an order to compel arbitration pursuant to § 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, and then either dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) [1] or stay the proceedings pursuant 9 U.S.C. § 3.[2] Defendant's Motion at PageID.204. "Granting a motion to compel arbitration effects a summary disposition of the factual issue of the existence of an arbitration agreement." *Anderson v. Delta Funding Corp.*, 316 F. Supp. 2d 554, 558 (N.D. Ohio 2004) (internal quotation marks and brackets omitted). "The Court should therefore consider facts in the light most favorable to the Plaintiff when determining whether a valid and enforceable arbitration agreement exists and exercise its wide discretion to look beyond the complaint at pleadings and documents submitted by either party." *Id.*

The FAA favors the implementation of arbitration agreements:

---

[1] In *Knight v. Idea Buyer, LLC*, 723 Fed. Appx. 300, 301 (6th Cir. 2018), the court explained:

"[T]his court has held that a party's 'failure to pursue arbitration' in spite of a compulsory arbitration provision means that the party 'has failed to state a claim,' meaning that a motion to dismiss on such grounds is 'properly construed as a motion . . . under Rule 12(b)(6).' *Teamsters Local Union 480 v. United Parcel Serv., Inc.*, 748 F.3d 281, 286 (6th Cir. 2014). A motion to dismiss pursuant to an arbitration agreement should therefore be construed as a Rule 12(b)(6) motion even if it is mislabeled as a Rule 12(b)(1) motion. *See id*."

[2] Title 9 U.S.C. § 3 provides:

"If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

The FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Memorial Hospital v. Mercury Construction Corporation*, 460 U.S. 1, 24 (1983). The federal policy favoring arbitration requires courts to "rigorously enforce agreements to arbitrate." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987).

The FAA provides a mechanism to enforce arbitration agreements:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

9 U.S.C. § 4.

When a party asks to compel arbitration under a contract, the court has four tasks. First, "it must determine whether the parties agreed to arbitrate". *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). Second, "it must determine the scope of that agreement." *Id*. Third, "if federal statutory claims are asserted, it must consider whether Congress intended those claims to

8

be nonarbitrable." *Id*.  Fourth, "if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration." *Id*.   "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital*, 460 U.S. at 24-25.

## B.   Discussion

### 1.   Plaintiff agreed to arbitration

Here, The Cash App Terms of Service include an agreement to arbitrate before a single arbitrator "any and all Disputes," defined as "any claim, controversy, or dispute between you and Block . . . including any claims relating in any way to these Terms or the Services, or any other aspect of our relationship."  Cash App Terms of Service ( ¶ 18 "Disputes" and ¶ 19 "Binding Arbitration") (ECF No. 8-3, PageID.125-134.) The arbitration agreement states in relevant part as follows:

> **If you are an individual Cash user, this arbitration provision applies to you:**
>
> **General.** You and Block agree that any and all Disputes, except those that are resolved informally or brought in a small claims court, will be arbitrated by a neutral arbitrator who has the power to award the same individual damages and individual relief that a court can. . . . YOU WAIVE ANY RIGHT TO HAVE YOUR CASE DECIDED BY A JURY . . . . If any provision of this arbitration agreement is found unenforceable, the unenforceable provision will be severed, and the remaining arbitration terms will be enforced (but in no case will there be a class or representative arbitration). . . .
>
> **Scope of Arbitration.** If we are not able to resolve the Dispute by informal negotiation or, as provided below, in a small claims court, all Disputes will be resolved finally and exclusively by binding individual arbitration with a single arbitrator (the "Arbitrator") administered by the American Arbitration Association (https://www.adr.org) according to this Section and the Consumer Arbitration Rules through the Procedures for the Resolution of Disputes through Document Submission (the "Desk/Documents Only" arbitration) (the "AAA Rules"), including Rule D-3(b), except you and Block will have the right to file early or

summary dispositive motions and so long as the claim is arbitrable under the AAA Rules. Except as set forth above, and for disputes subject to jurisdiction in small claims court, the Arbitrator shall be responsible for determining all threshold arbitrability issues, including issues relating to whether the Cash App Terms (or any aspect thereof) are enforceable, unconscionable or illusory and any defense to arbitration, including waiver, delay, laches, or estoppel.

*Id*. at PageID.126-128. The Cash App Terms of Service provide that, "Our relationship is governed by the laws of California, federal law, or both." *Id*. at § 20, PageID.134-135.

Defendant points out that for plaintiff to use Cash App, she (like other Cash App customers) needed to agree to the Cash App Terms of Service when she signed up for a Cash App account.  Wallace Wu, engineering manager for Cash App, explained this process in a declaration:

6. To use Cash App, a customer must first download the application and sign up for a Cash App account. Block offers online registration through the mobile application. Customers cannot use Cash App until after they have completed the registration, including by agreeing to the Cash App Terms of Service (as well as certain other terms and conditions).

7. On May 14, 2018, Ms. Rodriguez used an iPhone to create a Cash App account in her name, following the typical online Cash App account creation process available through the Cash App mobile application in place on that date. According to Block's activity logs for Ms. Rodriguez's Cash App account, Ms. Rodriguez used the account periodically after May 14, 2018 until April 23, 2022.

*See* Wu Decl. (ECF No 8-3, PageID.40-41).

Mr. Wu further explained:

8. Like other Cash App customers that used an iPhone to sign up for Cash App, Ms. Rodriguez agreed to the Cash App Terms of Service according to the following procedure:

a. First, Ms. Rodriguez entered an email address or a phone number.

b. Second, Ms. Rodriguez was provided with a sign-in code by her selected means of communication (either an email or a text message sent to the provided phone number), which she then needed to enter into the Cash App to proceed with the sign-up process.

c. Third, Ms. Rodriguez received a prompt to provide her email address or phone number [picture omitted], which is materially

10

identical to what Ms. Rodriguez would have seen on her iPhone at the time of sign-up.

d. Fourth, Ms. Rodriguez received a text message with a six-digit sign-in code that advised "[b]y entering, you agree to the Terms, E-Sign Consent, and Privacy Policy: https://squareup.com/legal/cash-ua" (*i.e.*, the Cash App Terms of Service). The text message sent to Ms. Rodriguez's iPhone would have appeared to her in a form materially identical to that depicted below [picture omitted], which includes a preview of the Cash App Terms of Service.  If Ms. Rodriguez tapped to load the preview in the text message, she would have seen a message materially identical to that depicted below [picture omitted], which contained a clickable hyperlink that, if clicked on, would have automatically directed Ms. Rodriguez to the Cash App Terms of Service, which were available online. . .

9. Like all Cash App customers, Ms. Rodriguez could not have completed the process of creating a Cash App account (and could not use Cash App's services) unless and until she entered the sign-in code provided immediately next to the language stating that "[b]y entering, you agree to the Terms, E-Sign Consent, and Privacy Policy," followed by a hyperlink to the Cash App Terms of Service. Affirmatively entering the sign-in code indicates agreement to the Cash App Terms of Service.

10. I have reviewed Block's Cash App internal records relating to Ms. Rodriguez's Cash App account, and those records show that she successfully completed the Cash App account creation process.

*Id*. at PageID.42-44(emphasis omitted).

In response, plaintiff contends that she did not agree to arbitrate.  Plaintiff contends that because she never "clicked on the terms" when she entered the sign in code, she was not aware of the arbitration requirement.  Plaintiff's Response (ECF No. 23, PageID.230-231).  In this regard, plaintiff stated in a declaration that, "I never opened up, clicked on, or visited any hyperlink, read any of the terms and conditions concerning the arbitration clause and never agreed to arbitrate in any way."  Rodriguez Decl. (ECF No. 24, PageID.236).

In cases involving a smartphone or online-based contract, "[c]ourts around the country have recognized that [an] electronic 'click' can suffice to signify the acceptance of a

11

contract . . . as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement." *Meyer v. Uber Technologies, Inc*., 868 F.3d 66, 75 (2d Cir. 2017) (citation and internal quotation marks omitted) (applying California law to hold that Uber provided reasonably conspicuous notice of terms of service when notice of terms and conditions appeared on the page where users entered payment information); *see also Peter v. Doordash, Inc.*, 445 F. Supp. 3d 580, 587 (N.D. Cal. 2020) (in applying California law, court compelled arbitration when hyperlink to terms and conditions was provided on sign-in page, stating "the Court holds that Plaintiffs were on inquiry notice of DoorDash's T & C [Terms of Service] and that they are bound by its terms").  Here, defendant presented clear and conspicuous notice of the terms to plaintiff.  Reasonable users would know that they were agreeing to the hyperlinked Cash App Terms of Service – which included the agreement to arbitrate – when they entered the six-digit sign-in code, whether they clicked on the hyperlink or not. *See Meyer*, 868 F.3d at 79 ("As long as the hyperlinked text was itself reasonably conspicuous . . . a reasonably prudent smartphone user would have constructive notice of the terms. While it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice.").  For these reasons, the Court concludes that when plaintiff signed into her Cash App account and then used the account, she agreed to the terms regulating that account, including the arbitration agreement.

## 2.    Plaintiff's dispute is within the terms of the arbitration agreement

As discussed in § III.B.1, under the arbitration agreement "all Disputes, except those that are resolved informally or brought in a small claims court, will be arbitrated by a neutral arbitrator who has the power to award the same individual damages and individual relief that a court can." Cash App Terms of Service at PageID.126.  Here, plaintiff filed this federal lawsuit

alleging, among other things, that defendant did not allow her "to file a charge back dispute of her defrauded funds", did not report the identity theft report to the "Credit Bureaus," and did not investigate the "scam."  These claims are "disputes" subject to the arbitration agreement.

### 3.  Congressional intent

As to the third task, plaintiff does not contend that Congress intended to make these types of claims "nonarbitrable."

### 4.  Plaintiff's lawsuit should be dismissed

As to the fourth task, the Court concludes that a stay of the proceedings would not be appropriate.  All of the statutory claims alleged by plaintiff are subject to arbitration and as discussed, *supra*, plaintiff fails to state a claim for relief on the state law torts.  In the alternative, the entire lawsuit could be dismissed for failure to state claim.  *See Knight v. Idea Buyer, LLC*, 723 Fed. Appx. 300, 301 (6th Cir. 2018) (a party's "failure to pursue arbitration" in spite of a compulsory arbitration provision means that the party "has failed to state a claim" under Fed. R. Civ. P. 12(b)(6)).

### 5.  Summary and conclusion

After reviewing plaintiff's claims and the arbitration agreement, the Court concludes that defendant's motion to compel arbitration should be granted and that plaintiff's amended complaint should be dismissed.

### IV.  RECOMMENDATION

For these reasons, I respectfully recommend that defendant's combined motion (ECF No. 21) be resolved as follows:

**A.** With respect to the motion to dismiss for lack of federal subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), the motion should be **DENIED**.

**B.**  With respect to the motion to dismiss for failure to state a claim for relief pursuant to Fed. R. Civ. P. 12(b)(6), the motion should be **GRANTED** as to plaintiff's state law claims for negligent and/or intentional infliction of emotional distress, "unclean hands" and retaliation and **DENIED** with respect to the federal and state statutory claims.

**C.**  With respect to the motion seeking an order to compel arbitration, the motion should be **GRANTED**.  Accordingly, the Court should enter an order directing the parties to proceed to arbitration in accordance with the terms of the arbitration agreement and **DISMISS** this action.

Dated:  February 27, 2023                    /s/ Ray Kent
                                             RAY KENT
                                             United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).